

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 10, 2017**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| THRU, INC., | § | Case No. 17-31034 |
| | § | |
| Debtor. | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER CONFIRMING AMENDED CHAPTER 11 PLAN
OF REORGANIZATION (AS MODIFIED) OF
THRU, INC., DEBTOR AND DEBTOR IN POSSESSION**

The Court having commenced a hearing on June 27, 2017 (the "***Confirmation  Hearing***"),

to consider confirmation of the plan of reorganization proposed by Thru, Inc. (the "***Debtor***"), the

debtor and debtor in possession in the above-captioned chapter 11 case;

IT FURTHER APPEARING TO THE COURT that the Debtor filed on April 6, 2017,

*Chapter 11 Plan of Reorganization* [Docket No. 43], which was amended thereafter on May 11,

2017 [Docket No. 68] (the "***Amended Plan***"), and modified thereafter on June 5, 2017 [Docket

No. 87] and again on June 22, 2017 [Docket No. 104] (all such modifications, together with those

modifications announced on the record at the Confirmation Hearing, the "***Plan Modifications***,"
and the Amended Plan as modified, the "***Plan***");[1]

IT FURTHER APPEARING TO THE COURT that, in accordance with the Court's order,
entered May 15, 2017 [Docket No. 75] (the "***Solicitation Order***"), the *Disclosure Statement in
Support of Amended Chapter 11 Plan of Reorganization* [Docket No. 67] (the "***Disclosure
Statement***") was previously approved by the Court and the Debtor was authorized to solicit votes
to accept or reject the Plan;

IT FURTHER APPEARING TO THE COURT that the Debtor filed with the Court a
*Notice of Plan Supplement* [Docket No. 89] that included both the Assumed Contract Schedule
and proposed forms of Plan Note and Exit Facility to be executed in conjunction with the Plan;

IT FURTHER APPEARING TO THE COURT that no objection to the Plan was filed
except for the objection of Dropbox, Inc. ("***DBI***") [Docket No. 208];

IT FURTHER APPEARING TO THE COURT that (i) the deadline for casting ballots to
accept or reject the Plan has passed; and (ii) Michael P. Cooley, acting as balloting agent has filed
his certification (the "***Cooley Declaration***") [Docket No. 103] certifying both the tabulation and
result of all voting on the Plan;

IT FURTHER APPEARING TO THE COURT that the Debtor modified Section 10.1(d)
of the Plan on the record at the Confirmation Hearing to replace clause (ii) with "the date the final
payment to DBI is due under the Plan"; and

NOW, THEREFORE, after consideration of the Plan, the Plan Supplement, the evidence
adduced at the Confirmation Hearing, the arguments of counsel, and the entire record of the chapter

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the Plan.

11 case; and after due deliberation thereon and good cause appearing therefor, and for the reasons set forth on the record at the Confirmation Hearing,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.     *Jurisdiction; Venue; Core Proceeding*.  The Court has jurisdiction over the Debtor's case and the contested matters arising therein pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O).  The Court also has constitutional authority to issue a final order in this matter.

B.     *Judicial Notice*.  The Court takes judicial notice of the docket of the Debtor's chapter 11 case maintained by the Clerk of the Court, including all pleadings and other filings, all orders, and all evidence and argument admitted or adduced at the hearings held before the Court during the pendency of the chapter 11 case.

C.     *Transmittal and Mailing of Solicitation Materials and Notices*.  The solicitation materials and notices prescribed by the Solicitation Order were served in compliance with the Solicitation Order, and such service was adequate and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and the other deadlines and matters required to be noticed pursuant to the Solicitation Order was given in compliance with the Bankruptcy Rules and the Solicitation Order, and no other or further notice is or shall be required.

D.     *Adequacy of Solicitation Procedures*.  All procedures used to distribute the solicitation materials to the appropriate creditors entitled to vote on the Plan and to tabulate the ballots returned by creditors were fair and were conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.  Votes for

---

[2] The findings of fact and the conclusions of law stated in this Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to the proceeding by Fed. R. Bankr. P. 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

acceptance or rejection of the Plan were solicited in good faith and only after transmittal of a disclosure statement containing adequate information in compliance with §§ 1125 and 1126[3] and Fed. R. Bankr. P. 3017 and 3018.

E. _Good Faith Solicitation – § 1125(e)._ Based on the record before the Court in the chapter 11 case, the Debtor, the Debtor's Professionals, and all of their respective officers, directors, employees, and agents have acted in good faith within the meaning of § 1125(e), and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Order in soliciting acceptances of the Plan and are entitled to the protections afforded by § 1125(e).

F. _Impaired Classes that have Voted to Accept or Reject the Plan._ Under the Plan, Creditors in Classes 3, 4, 5 6, and 7 were impaired and entitled to vote to accept or reject the Plan.[4] As evidenced by the Cooley Declaration, which certified both the method and results of the voting, Classes 3, 5, and 7 accepted the Plan and Class 6 rejected the Plan in accordance with the requirements of § 1126. Class 1 is unimpaired and therefore deemed to accept the Plan. There are no Creditors in Class 4.

G. _Debtor's Releases, Exculpations and Injunctions._ The Court hereby finds that each of the release, exculpation and injunction provisions set forth in Article IX of the Plan is (a) within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) essential to the implementation of the Plan; (c) warranted by the circumstances of the case; (d) fair, equitable, and in the best interests of the Debtor and its Estate and Creditors; (e) important to the overall objectives of the Plan to finally resolve all Claims among or against

---

[3] Unless otherwise noted, section (§) references are to title 11 of the United States Code (the "**Bankruptcy Code**").

[4] Class 2 was intentionally deleted from the Plan.

the key parties in interest in the chapter 11 case with respect to the Debtor; and (f) consistent with §§ 105, 1123, and 1129, and other applicable provisions of the Bankruptcy Code.  The record of the Confirmation Hearing and the chapter 11 case is sufficient to support the release, exculpation, and injunction provisions contained in the Plan.  Notwithstanding anything to the contrary set forth in this Confirmation Order or in the Plan, nothing contained in the Plan or this Confirmation Order shall operate to release, discharge, exculpate, or enjoin any Tolled Claim until the expiration of the tolling period described in Section 10.1(d) of the Plan.

H.    *Plan Compliance with Bankruptcy Code*.  The Court finds that the Plan complies with §§ 1122, 1123, 1127, and all applicable provisions of § 1129(a), **except for § 1129(a)(8)**.  However, the Court concludes that § 1129(a)(10) has been complied with, in that at least one class of claims that is impaired (Class 5) under the Plan has accepted the Plan, determined without including any acceptance of the Plan by an insider.  Therefore, this Court is required to confirm the Plan, pursuant to § 1129(b) and the Debtor's request for "cram down," so long as the Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to Class 6—the Class consisting of DBI, which is impaired and has not accepted the Plan.  The Court finds that the Plan does not discriminate unfairly and is, indeed, fair and equitable as to DBI.

I.    *DBI's Objections to the Plan*.

(i)    *DBI's Objection that the Plan Improperly Classifies its Claim Separate from Other Unsecured Creditors, in Violation of § 1122 and 1129(a)(1)*:  Overruled.

The Plan, of course, separately classifies DBI (in Class 6) from other general unsecured creditors (in Class 5).  The two classes are provided with slightly different treatment—although the Plan proposes that both are to be paid cash in full over time.  Class 5 claims will be paid in cash in full over 60 months in equal installments.  DBI will be treated as having an allowed claim

in the full amount of its judgment ($2,297,432.09) for Plan purposes—although Debtor will continue with its appeal of that award at the Ninth Circuit—and will be paid in cash in full in equal monthly installments based upon a 10-year amortization schedule with interest at federal judgment rate, but with 3 large principal pay downs on 12/31/21, 12/31/22, and 12/31/23 that result in a payoff in just under 6.5 years (assuming the judgment is not reversed; if it is, disgorgement will be available to the Debtor for payments made to DBI under the Plan). The Court takes judicial notice that there are 15 unsecured creditors scheduled by the Debtor in this case besides DBI—all of these 15 creditors are trade creditors or professional service providers and the undisputed scheduled amount of these claims totals approximately $512,541. There are a few small additional proofs of claim. None of these trade claims or professional services claims appear to be insiders. The question before the Court is whether this is improper separate classification as to DBI, so as to violate § 1122 and 1129(a)(1) of the Bankruptcy Code?

The Court rules that the Plan's separate classification of DBI from other unsecured creditors is appropriate and fits within the flexible standards of § 1122.

Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). While this provision requires that all claims placed in the same class must be fundamentally similar to one another, courts have held that it does not require that all substantially similar claims be placed in the same class. To the contrary, "separate classification is permitted if there are "***good business reasons***" justifying the classification. *In re Premiere Network Servs., Inc.*, 333 B.R. 130, 133-34 (Bankr. N.D. Tex. 2005) (emphasis added) (quoting *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993)).

Thus, for example, *"[a] non-creditor interest* can justify separate classification if it gives [the creditor] 'a different stake in the future viability' of [the debtor] that may cause it to vote for reasons other than its economic interest in the claim." *In re Save Our Springs Alliance, Inc. v. WSI (II)-COS, LLC*, 632 F.3d 168, 174 (5th Cir. 2011) (emphasis added); *see also In re Premiere Network*, 333 B.R. at 133 (holding that "a non-creditor interest in the reorganized debtor meets the 'good business reason' standard and justifies separate classification of the creditor's claim"). Courts have found examples of such non-creditor interests in a variety of contexts, including where the creditor directly competes with the debtor and will continue to compete with the reorganized debtor or otherwise benefits more by the debtor's liquidation than its reorganization. *See, e.g., In re Premiere Network,* 333 B.R. at 134; *In re Tex. Star Refreshments, LLC,* 494 B.R. 684, 696 (Bankr. N.D. Tex. 2013) ("In short, CFG's position reveals that its real desire and indeed the way in which it benefits the most is by TSR's liquidation."); *In re Lightsquared Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014) (citing *In re Tex. Star Refreshments*) ("One such reasonable justification for separate classification is where a claimant is a competitor of the debtor."); *In re Graphic Comm'ns, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996) (holding that a rational business reason existed for classifying competitor separately from general trade creditors).

Here, the Court concludes that DBI has *"non-creditor interests"* that justify separate classification—in that it has been—at least since 2015—a competitor of the Debtor; it and the Debtor have competing rights to the DROPBOX mark (this will apparently remain true even if DBI's judgment against the Debtor is affirmed on appeal); and it is embroiled in continuing litigation with the Debtor. It is reasonable to infer that DBI would benefit if the Debtor does not reorganize because a competitor and user of the DROPBOX mark would no longer be in business and the Debtor's appeal of DBI's judgment in the Ninth Circuit would end. The Court, of course,

must make inferences about DBI's motivation, because DBI has no business person who apparently is involved with the DBI/Debtor disputes—only inhouse and outside lawyers. The Court would not allow an offered inhouse lawyer to testify about DBI's voting motivations because: (a) DBI had opposed a motion to compel discovery pre-confirmation, on the basis that anything responsive would be privileged since only inhouse and outside lawyers dealt with Debtor matters; and (b) the Court believed it was inappropriate for an inhouse lawyer to testify about DBI's motivations for voting when DBI had previously dodged discovery regarding plan issues.

In any event, it appears clear to this court that DBI has non-creditor interests here that justify separate classification. The *Texas Star Refreshments* case is relevant on this point. The debtor there filed a voluntary chapter 11 petition in response to a judgment entered against it in favor of Custom Foods Group (CFG) for $910,000 for damages arising from claims for misappropriation of trade secrets, interference with contractual relations, and other matters. *In re Tex. Star,* 494 B.R. at 690. In its plan, the debtor separately classified CFG from its other major trade vendors, as the court observed, because the debtor's "survival is dependent on maintaining good business relations with them." *Id.* at 691. Concluding that the debtor's separate classification of CFG from the other trade creditors was "reasonable and proper," the court observed that

> If its plan fails, the likely scenario is liquidation, in which case CFG recovers nothing on account of its judgment. In short, CFG's position reveals that its real desire and indeed the way in which it benefits the most is by TSR's liquidation. Now, given the judgment it obtained, CFG essentially argues that TSR should not be given an opportunity to reorganize. CFG's interest is therefore different from that of other unsecured creditors, who have approved of the TSR Plan given it provides for payment in full of their claims. TSR's trade vendors, in addition, have an interest in continuing to sell their products to TSR, just as TSR has a business need to continue purchasing their products.

*Id.* at 696. In another similar case, *In re STC, Inc.*, the debtor separately classified one of its competitors, who also held a recently-acquired judgment against the debtor for patent

infringement, from its other trade creditors. *In re STC, Inc.*, 2016 BL 110228 (Bankr. S.D. Ill. Apr. 7, 2016). In concluding that the separate classification of the judgment creditor was warranted, the court observed,

> GTT [the judgment creditor] is a direct and strong competitor of STC [the debtor], and as such, has a substantially different interest in the Plan from the trade creditors. If STC's plan is not confirmed, the company has no chance of surviving. With the elimination of STC as a significant competitor, GTT will substantially improve its position in the marketplace. Clearly, GTT has a "non-creditor interest" in the reorganized debtor, and for that reason, separate classification of its claim is proper.

*Id.* at *7.

The case before the Court bears a close resemblance to the facts faced by the court in *Texas Star Refreshments* and *STC, Inc.* Like the judgment creditors in those cases, DBI is neither a customer nor a vendor of the Debtor. Rather, since approximately 2015, when DBI expanded from its consumer roots to begin offering an enterprise solution known as "Dropbox Business," DBI has competed with the Debtor in the enterprise file sync and sharing (EFSS) industry. According to the credible evidence presented, industry research organizations confirm the competitive relationship between the two, which DBI itself acknowledges on its own website. Additionally, DBI and the Debtor assert competing rights to the DROPBOX mark, although DBI has never accused the Debtor of infringement and the Debtor believes DBI would now be barred from doing so. They only way DBI can now obtain clear title to the trademark is to put the Debtor out of business or force the Debtor to abandon its rights by using its superior resources in the courts.

Citing the Fifth Circuit's decision in *In re Save Our Springs Alliance, Inc. v. WS(II)-COS, LLC,* 632 F.3d 168 (5th Cir. 2011), DBI argues in its Confirmation Objection that "[w]here … litigation is related to [a] creditor's claim, considerations related to it are part of the creditor's interest as a creditor and thus are appropriate motivations for voting that do not justify separate

classification." Confirmation Objection, at 25 (quoting *Save Our Springs*, 632 F.3d at 175 n. 13). Here, though, the evidence of DBI's non-creditor interests is overwhelming and, as Judge Houser cautioned in *In re Heritage Organization, L.L.C.,* "a careful reading of many of the noncreditor interest cases cited above suggests that the courts were not focused on the facts, but on the voting motivation flowing from those facts." *In re Heritage Organization, L.L.C.*, 375 B.R. 230, 304 (Bankr. N.D. Tex. 2007) (concluding that separate classification is permitted "where there is evidence that the claimant will vote its claim based upon its non-creditor interest in the case, rather than based upon its economic interest as a creditor"). In any event, this is not just a matter of DBI's litigation with the Debtor and discerning DBI's motivation for voting that may result from that litigation. DBI is a business competitor and a competing user of the DROPBOX mark and it is entirely inferable from the record that DBI clearly desires unfettered rights to the DROPBOX mark. To reiterate, it is not merely the litigation involved here that makes the Court conclude that DBI has noncreditor interests that predominate.

Accordingly, the Court concludes the Plan's separate classification of DBI from other unsecured creditors is appropriate and fits within the flexible standards of § 1122. *See In re Chateaugay Corp.*, 89 F.3d 942, 949-50 (2d Cir. 1996) ("Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability."); *In re Great Bay Hotel & Casino, Inc.,* 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (separate classification of similar claims permitted when classification "promotes the rehabilitative goals of Chapter 11"); *In re 11,111, Inc.,* 117 B.R. 471, 476 (Bankr. D. Minn. 1990)(same).

(ii)     *DBI's Objection that the Plan Does Not Comply with § 1129(a)(7)— the "Best Interest Test"*:  Overruled.

The Court determines that the Plan satisfies the best interests test as demonstrated by the liquidation analysis (the "***Liquidation Analysis***"). See, e.g., Disclosure Statement, Appendix 3, as modified by testimony at Confirmation Hearing. As the Liquidation Analysis indicated, estimated recoveries for members of each class of impaired creditors are substantially more than what they could expect to receive in a hypothetical chapter 7 liquidation. To highlight this point, the Debtor envisioned a best case scenario for purposes of its Liquidation Analysis in which a chapter 7 trustee could sell all the Debtor's assets for their current book values. The Debtor further assumed the prepetition liens securing the Prepetition Facility from the Debtor's insider would be invalidated, so that the $865,000 Prepetition Lender Claims would share pari passu with DBI and other unsecured creditors. Even in that scenario, the Liquidation Analysis projects only a 22% recovery to unsecured creditors. See Disclosure Statement, Appendix 3. The Liquidation Analysis does not provide a separate estimate of the potential recoveries from claims and causes of action that might be pursued in a hypothetical chapter 7; however, even a superficial review of those potential claims strongly suggests that any recoverable value from those claims would be negligible. Additionally, the Liquidation Analysis indicated $437,799 of cash currently on hand and, in reality, the evidence at the confirmation hearing indicated that the Debtor currently had less than $200,000 on hand. In summary, the Court does not conclude that DBI would recover more in a liquidation than under the Plan.

      (iii)    *DBI's Objection that the Plan Does Not Comply with § 1129(a)(11),*
               *as it is Not Feasible*:  Overruled.

§ 1129(a)(11) requires that a court find that a plan is feasible in order to confirm it. Specifically, the Bankruptcy Court must determine that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed

in the plan. In order to satisfy § 1129(a)(11), the Fifth Circuit has explained that "'the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required." All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997). Factors commonly considered by courts in determining whether a plan is feasible include "(1) the debtor's capital structure, (2) the earning power of the business, (3) economic conditions, (4) the ability of debtor's management, (5) the probability of continuation of management, and (6) any other related matter." *In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr N.D. Tex. 2015); *see also In re Geijsel*, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012).

DBI presented evidence challenging the Debtor's projections. Not only has this Debtor (founded in 2002) suffered years of operating losses, but it has depended on investors 31 times in its 15 year history to fund $20 million of past losses. DBI's expert described the Debtor as still being in startup mode after 15 years. DBI's expert did not see its cash burn rate reversing. DBI's expert believes the Debtor is insolvent and has inadequate capitalization. DBI's expert opined that the Debtor's revenues were likely overly rosy and its projected expenses unrealistically low. In summary, he did not trust the Debtor to be able to make its Plan payments.

The Court concludes, however, that the Plan is feasible. First, the Debtor's capital structure, though lean at times, is adequate to sustain the Debtor's obligations under the Plan. *In re Geijsel,* 480 B.R. at 257 ("Though courts do not need to assume the worst, they should be wary of a plan in which 'virtually all of the income' goes to paying off the plan without a 'sufficient buffer' to weather economic storms."). In addition to existing cash flow from operations, the Plan contemplates an additional $1 million in capital from the proceeds of the Exit Facility from a

reliable source—investors who have funded the Debtor in the past. In addition, while there are no written commitments above the $1 million, the investors' long track record of sustaining the Debtor's business over the past fifteen years cannot be ignored. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801 (observing that "speculative prospects of failure cannot defeat feasibility"). Next, the Debtor's cash flow forecast is based upon concrete projections. The cash flow forecast was based upon some reduction of expenses and a conservative 5% growth rate on future revenue. The testimony was credible regarding existing significant clients (several well-known clients were listed and the Debtor's CEO credibly testified about 180 enterprise clients altogether and a million log-ins sent through the Debtor). There was also credible testimony regarding a couple of new products (OptiFLOW and OptiBAND) and certain new business that would likely come from these products. With regard to "economic conditions" and "ability of management," these factors sometimes are best examined by identifying the "root cause" of the bankruptcy filing and determining "(1) whether it was the debtor's fault, and (2) whether it is gone or likely to be gone soon." *In re Geijsel*, 480 B.R. at 259. In the instant case, the root cause of the filing is uncontroverted: the Debtor was compelled to seek relief in chapter 11 following the award of nearly $2.3 million in legal fees to DBI following an adverse summary judgment ruling. Despite being generally "unprofitable" in traditional financial terms, the Debtor's business was—and is— otherwise operating successfully and continuing to grow year over year. The Debtor only has about $500,000 of trade debt (besides DBI's judgment—which is on appeal) and $865,000 of insider debt. Moreover, the Debtor continues to enjoy the unwavering support of an investor pool that has sustained the Debtor's growth over the past fifteen years. The very fact that the Debtor had only fifteen unsecured creditors (including DBI) at the Petition Date underscores the general health of the Debtor's financial condition and business operation.

In summary, this court does not consider the Plan to be a "hope plan." The Court believes it is going to succeed.

> (iv)    *DBI's Objection that the Plan Does Not Comply with § 1129(b) and, thus Cannot be "Crammed Down" on It*:  Overruled.

    (a)    The Plan is Fair and Equitable with Respect to DBI.

Section 1129(b) requires a plan to be "fair and equitable" in order to be confirmed over the objection of a dissenting, impaired class. Here, of course, Class 6, consisting of DBI, is a dissenting, impaired class. Thus, the Court must look at what is required for the Plan to be "fair and equitable" as to Class 6. The "fair and equitable" requirement, as articulated in § 1129(b)(2), is commonly referred to as the "absolute priority rule," and generally provides that existing equity owners can neither receive nor retain any value under a plan unless senior dissenting creditors are paid in full. In this case, since the Plan proposes that existing equity owners will retain their ownership interests in the Debtor, the Court must examine whether DBI is being paid in full. In the case of unsecured creditors, such as Class 6/DBI, § 1129(b)(2)(B) is specifically applicable; it simply states, with regard to unsecured creditors, that a plan must provide "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B)(i). Section 1129(b)(2)(B), thus, permits a debtor to pay an unsecured creditor's claim in full over a period of time, but there is essentially a present value requirement that necessitates the payment of an appropriate rate of return (or, as some courts say, "interest") when the debtor proposes to pay a claim over a period of time. *See, e.g., In re Cornwall Personal Ins. Agency, Inc.,* 308 B.R. 771, 774 (Bankr. N.D. Tex. 2003). As for what rate of return or "interest" is necessary or sufficient to satisfy the absolute priority rule, § 1129(b) is silent.

In this case, the Debtor has proposed to pay DBI in full in equal monthly installments, based upon a 10-year amortization schedule, with interest accrued and payable thereon at the ***federal judgment rate*** in effect on the effective date of the Plan.  The Debtor's rationale is that DBI's claim is based on a federal judgment—so the Debtor is proposing exactly what DBI would be entitled to outside of bankruptcy. As of today's date, the federal judgment rate is 1.22%.  The Plan actually will result in DBI being paid in full in approximately 6.5 years, due to certain periodic lump sum paydowns on December 31, 2021, December 31, 2022, and December 31, 2023.  DBI argues that the federal judgment rate is far too low to be fair and equitable and provide it with the present value of its allowed claim.  However, DBI did not have an expert witness to specifically provide evidence regarding what rate would be fair and equitable.  DBI provided an expert to opine only about the feasibility of the Plan—although such expert did gratuitously state at one point that he thought an appropriate rate of return for an unsecured creditor under the Debtor's Plan would be above 20%.

The parties have identified just a handful of cases where courts have been faced with the question of selecting the appropriate cram down rate for an ***unsecured*** creditor.  Arguably, the analysis should be the same with secured creditors and unsecured creditors.  In any event, in the universe of cram down of secured creditors, there is plenty of case law (much of which is inconsistent).  For a dissenting class of ***secured*** claims, some courts have looked to the United States Supreme Court's decision in *Till v. SCS Credit Corp.* as some guidance for determining the appropriate "cramdown" rate of interest to be paid in a Chapter 11 case—even though *Till* involved a Chapter 13 case.  *Till v. SCS Credit Corp.,* 541 U.S. 465 (2004).    In the *Till* case, the Supreme Court (in a plurality opinion) addressed the proper rate of interest required to be used with regard to payments to a secured car lender on a cram down loan under a proposed Chapter 13 plan.  The

Court assessed five possible methods for calculating an appropriate interest rate: the coerced loan theory, the presumptive contract rate approach, costs of funds approach, formula approach, and risk-free approach, ultimately declaring the formula approach the victor. *Id.* at 479-80. Under the formula approach, the Court indicated that, in deciding upon the appropriate rate of interest that must be paid to a secured lender being crammed down under a Chapter 13 plan, one starts with the national prime rate of interest charged to creditworthy commercial borrowers, and then adjusts that rate to appropriately reflect the typically greater risk of nonpayment by debtors who have filed bankruptcy. "The appropriate size of that risk adjustment depends . . . on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* at 479. The *Till* Court upheld the formula of prime plus 3% as an appropriate rate of interest for the case before it.

This court, in the case of *Northwest Timberline*, involving a secured lender in the context of a Chapter 11 cram down, noted that, since *Till*, there has not only been debate about its precedential value (as it was a plurality opinion) but also concerning its applicability to Chapter 11 cases. *In re Nw. Timberline Enters., Inc.*, 348 B.R. 412 (Bankr. N.D. Tex. 2006) (citing *In re Mirant*, 334 B.R. 800, 820-24 (Bankr. N.D. Tex. 2005)). The Fifth Circuit has on a couple of occasions emphasized the limited value of the *Till* decision, holding in *Drive Financial Services, LP v. Jordan,* 521 F.3d 343, 350 (5th Cir. 2008), that "the *Till* plurality's adoption of the prime-plus interest rate approach is binding precedent in cases presenting an essentially indistinguishable factual scenario." *See also Wells Fargo Bank N.A. v. Tex. Grand Prairie Hotel Realty, LLC (In re Tex. Grand Prairie Hotel Realty, LLC)*, 710 F.3d 324, 331 (5th Cir. 2013) ("While many courts have chosen to apply the *Till* plurality's formula method under Chapter 11, they have done so because they were persuaded by the plurality's reasoning, not because they considered *Till*

binding.").  The debate about *Till*'s utility in Chapter 11 was largely fueled by a footnote in *Till* that offers a guiding principle that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Till*, 541 U.S. at 476 n.14.  In *Northwest Timberline,* this court was confronted with a hotly contested Chapter 11 plan in which the appropriate cram down interest rate for a secured lender was at issue.  Two testifying expert witnesses testified extensively regarding whether or not they thought there was an efficient market for loans similar to what was being offered to the secured lender under the plan and, if so, what that market dictated. This court expressed in *Northwest Timberline*, and continues to believe, that the correct rate of return, for purposes of § 1129(b)(2), should generally be the rate that the market would require a debtor to pay for financing the amount of the creditor's claim, and the market rate would necessarily take into account loan-specific and debtor-specific criteria (*e.g.,* the amount financed, the ratio of the amount financed to the debtor's assets, the debtor's leverage, the debtor's performance history, the industry, et cetera).  However, as also stated in *Northwest Timberline*, the market rate might not be all-controlling—assuming there is a market.  The market would have to be efficient for it to be all-controlling.  The market might, in fact, too highly assess the risk of (or unfairly put a taint on) the debtors coming out of bankruptcy. *Mirant*, 334 B.R. at 822 n. 71.

    In any event, as noted, ***the Court had no real evidence in the case at bar of what the market rate might be in this context.***  DBI's expert opined as to feasibility and only had an unsubstantiated oral statement that he thought the market might require a 20%-plus rate of return for a loan equivalent to DBI's plan treatment.  So without any real evidence, what is this court to do?

This court finds the *Texas Star* decision out of this District (discussed earlier) to present very similar facts and to be compelling. *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 701-02 (Bankr. N.D. Tex. 2013) (Judge Jones). In *Texas Star*, a dissenting unsecured creditor against whom cram down was sought had obtained a state court judgment against the debtor, and the debtor in its plan proposed to pay interest on the creditor's unsecured claim at the state court judgment rate of 5% per annum. *Id.* at 702 (noting that "the 5% rate here was selected because it is the same as the judgment rate"). In *Texas Star*, Judge Jones first opined why he thought a traditional *Till* analysis, to the extent useful in Chapter 11, might not apply equally to an unsecured creditor as to a secured creditor.

> The obvious difference between the present case and *Till*, as with the vast majority of cases addressing this issue, is that here the Court is concerned with an unsecured claim. At first blush, it appears that an unsecured creditor should receive a higher interest rate than a secured creditor, given the risk of non-payment. This analysis fails, however, when the relative risks of liquidation and confirmation are considered. A secured creditor's risk may increase given a debtor's continued use of the creditor's collateral. An unsecured creditor's prospects of repayment may indeed be enhanced if the debtor survives and the only other real alternative is liquidation.

*Id.* at 701-702. In any event, Judge Jones concluded that the adoption of a 5% interest rate in that case satisfied certain of the principles of the *Till* plurality, in particular because "though the 5% rate results from a state court judgment rate, such judgment rate is in turn based on state law and is therefore based on an objective standard." *Id.* at 702.

The federal judgment rate serves just such a purpose. Under federal law, "interest shall be allowed on any money judgment in a civil case recovered in a district court" and is calculated from the date of entry of the judgment at a rate equal to the weekly average one-year constant maturity treasury yield. 28 U.S.C. § 1961(a). The one-year treasury yield is a fluctuating rate that fluctuates with economic conditions and has at times been well over 10%. Its purpose "is to compensate the

successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damages and the payment by the defendant." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 828 (1990). That it is currently low is not unfair to judgment creditors (any more than it conferred a windfall at higher rates). It is an objective standard that applies with equal force to all federal judgment creditors. Utilizing this rate in a cram down context for an unsecured judgment creditor provides it with precisely what that creditor would have been entitled to receive as interest outside of the bankruptcy process. Finally, as observed by Judge Jones, in the particularly unusual case where an insolvent debtor is required to pay cram down interest, it properly reflects the substantial benefit to the unsecured creditor, who would otherwise likely receive only a fraction of its unsecured claim in a liquidation scenario.

In summary, while this court is inclined, in any Chapter 11 cram down context, to consider what an efficient market might dictate for a "loan" similar to what a plan provides for a creditor, in making the § 1129(b)(2) rate of return analysis—whether that creditor happens to be secured or unsecured—here, since (a) there was no real evidence for such a market; and (b) the dissenting creditor was a judgment creditor awarded a federal judgment rate shortly before the Debtor filed bankruptcy, this court is convinced that ***simply objectively applying the federal rate that this creditor would be entitled to outside of bankruptcy*** is "fair and equitable" in accordance with § 1129(b)(2)(B). Accordingly, DBI's objection is overruled.

(v)    The Plan Does Not Discriminate Unfairly Against DBI.

The Court determines that the Plan does not discriminate unfairly for all the reasons argued in the Debtor's Trial Brief [Docket No. 107] and the Court adopts those arguments as its reasoning on this objection.

J.    *Modifications*. Finally, for the sake of clarity, the Court finds that the Plan Modifications meets the requirements of §§ 1122, 1123 and 1129 of the Code and this ruling of

confirmation applies to the Plan, as modified. There is no need for further notice or solicitation since the Plan Modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity holder who has not accepted in writing the modification and the modifications are, thus, deemed accepted by all creditors and equity holders who have previously accepted the plan.

K.    _Plan Compliance with Bankruptcy Code – § 1129(a)(1)_.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying § 1129(a)(1).

(i)    _Proper Classification – §§ 1122, 1123(a)(1)_.  Aside from Administrative Claims and Priority Tax Claims, which need not be classified, the Plan designates seven Classes of Claims and Interests. The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. For the reasons set forth above, the Court concludes the Plan's separate classification of DBI from other unsecured creditors is appropriate and fits within the flexible standards of § 1122. Accordingly, the Plan satisfies §§ 1122 and 1123(a)(1).

(ii)    _Specify Unimpaired Classes – § 1123(a)(2)_.  Section 4.1 of the Plan specifies that Class 1 is unimpaired under the Plan, thereby satisfying § 1123(a)(2).

(iii)    _Specify Treatment of Impaired Classes – § 1123(a)(3)_.  Sections 4.3, 4.4, 4.5, 4.6, and 4.7 of the Plan designate Classes 3, 4, 5, 6, and 7 as impaired; and Article IV specifies the treatment of Claims and Interests in those Classes, thereby satisfying § 1123(a)(3).

(iv)    _No Discrimination – § 1123(a)(4)_.  The Plan provides for the same treatment by the Debtor for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying § 1123(a)(4).

(v)    _Implementation of Plan – § 1123(a)(5)_.  The Plan provides adequate and proper means for its implementation, thereby satisfying § 1123(a)(5).

(vi)    _Non-Voting Equity Securities – § 1123(a)(6)_.  No securities will be issued under the Plan; therefore, thereby satisfying § 1123(a)(6).

(vii)    _Selection of Responsible Person – § 1123(a)(7)_.  The Plan contain no provisions that are inconsistent with the interests of creditors and equity security holders and with public policy concerning the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee, thereby satisfying § 1123(a)(7).

(viii) *Additional Plan Provisions – § 1123(b)*. The other provisions of the Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

L. *Debtor's Compliance with Bankruptcy Code – § 1129(a)(2)*. The Debtor has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying § 1129(a)(2).

M. *Plan Proposed in Good Faith – § 1129(a)(3)*. The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying § 1129(a)(3). In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan. The Debtor filed its chapter 11 case and proposed the Plan in good faith and with legitimate and honest purposes including to (i) preserve the Debtor's business for existing stakeholders, including creditors, employees, customers, and owners, and (ii) maximize the recovery to Creditors under the circumstances of this case.

N. *Payments for Services or Costs and Expenses – § 1129(a)(4)*. As provided in Section 3.1 of the Plan, all payments made or to be made by the Debtor for services or for costs and expenses in or in connection with the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, are subject to the approval of the Court as reasonable, thereby satisfying § 1129(a)(4).

O. *Directors, Officers and Insiders – § 1129(a)(5)*. At the Confirmation Hearing, the Debtor adequately disclosed the identity and affiliations of the individuals proposed to serve on or after the Effective Date as officers and directors of the Reorganized Debtor. To the extent presently determinable, the nature of the compensation to be paid to such officers and directors has also been adequately disclosed. Accordingly, the Plan satisfies § 1129(a)(5).

P. _No Rate Changes – § 1129(a)(6)_. There is no regulatory commission having jurisdiction after confirmation of the Plan over the rates of the Debtor and no rate change provided for in the Plan requiring approval of any such commission. Accordingly, § 1129(a)(6) is not applicable.

Q. _Best Interests of Creditors – § 1129(a)(7)_. For the reasons set forth above, the Plan satisfies § 1129(a)(7).

R. _Acceptance or Rejection – § 1129(a)(8)_. As set forth in the Cooley Declaration, each of Classes 3, 5, and 7 voted to accept the Plan under § 1126(c) and (d). Class 1 is unimpaired and conclusively presumed to have accepted the Plan under § 1126(f). Class 6 did not accept the Plan within the requirements of § 1126(c); accordingly, the Plan does not satisfy § 1129(a)(8) with respect to Class 6. Nevertheless, for the reasons set forth above, the Plan is nevertheless confirmable because the Plan satisfies § 1129(b).

S. _Treatment of Administrative Expenses and Priority Claims – § 1129(a)(9)_. The treatment of Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims pursuant to Sections 3.1, 3.2, and 4.1 of the Plan satisfies § 1129(a)(9). Dallas County and Irving ISD (the "**Tax Authorities**") assert prepetition secured claims for year 2017 ad valorem business personal property taxes. The Tax Authorities shall receive payment in full of their Allowed Secured Claims in the ordinary course of business prior to the state law delinquency date. In the event the claims are not timely paid, the Tax Authorities shall receive postpetition interest from the Petition Date through the date of payment and post-Effective Date Interest at the state statutory rate pursuant to §§ 506(b), 511, and 1129. Notwithstanding any other provision in the Plan, the Plan Supplement or the Exit Facility, the Tax Authorities shall retain the liens that secure all amounts ultimately owed for tax year 2017 plus any penalties and interest that may accrue along

with the state law priority of those liens.  In the event of a default under the Plan, the Tax Authorities shall provide written notice to the Reorganized Debtor pursuant to § 11.15 of the Plan.  The Reorganized Debtor shall have 15 days from the date of the notice to cure the default.  If the Reorganized Debtor fails to cure the default, the Tax Authorities shall be entitled to pursue collection of all amounts owed pursuant to state law.

T.    *Acceptance by Impaired Class – § 1129(a)(10)*.  Each of Classes 3, 5, and 7 is an Impaired Class of Claims or Interests that voted to accept the Plan, and Class 5 voted to accept the Plan without including any acceptance of the Plan by any insider.  Accordingly, the Plan satisfies § 1129(a)(10).

U.    *Feasibility – § 1129(a)(11)*.  For the reasons set forth above, the Plan satisfies § 1129(a)(11).

V.    *Payment of Fees – § 1129(a)(12)*.  All fees payable under 28 U.S.C. § 1930 on or before the Effective Date have been paid or will be paid within thirty days after the Effective Date or when otherwise due in the ordinary course as stated in Section 3.1 of the Plan.  Accordingly, the Plan satisfies § 1129(a)(12).

W.    *Continuation of Retiree Benefits – § 1129(a)(13)*.  The Debtor does not pay any retiree benefits within the meaning of § 1114.  Accordingly, § 1129(a)(13) is not applicable.

X.    *Domestic Support Obligations – § 1129(a)(14)*.  The Debtor does not pay any domestic support obligations.  Accordingly, § 1129(a)(14) is not applicable.

Y.    *Individual Debtor  – § 1129(a)(15)*.  The Debtor is not an individual.  Accordingly, § 1129(a)(15) is not applicable.

Z.    *Transfers by Nonprofits – § 1129(a)(16)*.  The Debtor is not a nonprofit.  Accordingly, § 1129(a)(16) is not applicable.

AA.     _No Unfair Discrimination – § 1129(b)(1)_.   For the reasons set forth above, the Court concludes that the Plan does not discriminate unfairly against Class 6 and may be confirmed under § 1129(b) notwithstanding the Plan's failure to satisfy § 1129(a)(8).

BB.     _Fair and Equitable – § 1129(b)(2)_.   For the reasons set forth above, the Court concludes that the Plan does not discriminate unfairly against Class 6 and may be confirmed under § 1129(b) notwithstanding the Plan's failure to satisfy § 1129(a)(8).

CC.     _Principal Purpose – § 1129(d)_.   The principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.   Accordingly, the Plan satisfies § 1129(d).

DD.     _Executory Contracts_.   The Debtor has exercised reasonable business judgment in determining whether to assume or reject each Executory Contract as provided under Article VII of the Plan.   Each party to an Executory Contract to be assumed by the Debtor has received sufficient notice of the proposed assumption and assignment of such Executory Contract and the proposed Cure Amount, if any, relating thereto.   The Debtor has cured, or provided adequate assurance that the Reorganized Debtor will cure under the provisions of the Plan, all defaults (if any) under or relating to each of the Executory Contracts to be assumed by the Debtor. The assumption or rejection of each Executory Contract in accordance with Article VII of the Plan is legal, valid, and binding upon all nondebtor parties to such Executory Contract, all to the same extent as if such assumption or rejection had been effectuated pursuant to a separate order of the Court entered under § 365.

EE. *Burden of Proof*. The Debtor, as proponent of the Plan, has met its burden

of providing the elements of §§ 1129(a) and (b) by a preponderance of the evidence. *In re Briscoe*

*Enters, Ltd., II*, 994. F.2d 1160 (5th Cir. 1993).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

2. Confirmation of Plan. The Plan, as modified by the Plan Modifications, is

confirmed under § 1129 and the other applicable provisions of the Bankruptcy Code.

3. Discharge. Except as otherwise provided in the Plan or this Confirmation Order,

the rights afforded in the Plan and the payments and distributions to be made hereunder shall

discharge all existing debts and Claims and terminate all Interests of any kind, nature, or

description whatsoever against or in the Debtor or any of its assets or properties to the fullest extent

permitted by § 1141. Except as provided in the Plan, upon the occurrence of the Effective Date,

all existing Claims against and Interests in the Debtor, shall be, and shall be deemed to be,

discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined

from asserting against the Debtor, the Reorganized Debtor, the Responsible Person, or their

successors or assigns, or any of their assets or properties, any other or further Claim or Interest

based upon any act or omission, transaction, or other activity of any kind or nature that occurred

prior to the Effective Date, whether or not such holder has filed a Proof of Claim or proof of

Interest and whether or not the respective facts or legal bases were known or existed prior to the

Effective Date.

4. Plan Classification Controlling. No motion to determine the classification of

Claims or Interests under the Plan was timely filed under Bankruptcy 3013 and the Solicitation

Order. Accordingly, the classification of Claims and Interests for purposes of the treatment of

such Claims and Interests under the Plan, including Distributions to be made thereunder, shall be governed solely by the terms of the Plan.

5.      Binding Effect.  Effective on the Effective Date, the Plan and its provisions shall be binding upon the Debtor, the Responsible Person, all Holders of Claims against or Interests in the Debtor, and all other parties in interest, including all governmental entities, whether or not such Claims or Interests are Impaired under the Plan and whether or not such Holders or parties in interests accepted the Plan.

6.      Approval of Plan Releases and Exculpation; Injunction.  Each of the release, exculpation and injunction provisions set forth in Article IX of the Plan is hereby approved, except as otherwise specifically modified by this Confirmation Order.

7.      Plan Implementation Authorization.  The Debtor, the Reorganized Debtor, and the Responsible Person are authorized and empowered from and after the date hereof to take all actions necessary to implement and consummate the Plan and the various transactions described therein.

8.      Exemption from Certain Taxes.  Pursuant to § 1146(a), neither the retention by Thru, LLC of all Interests in the Debtor and Reorganized Debtor nor the issuance, transfer, or exchange of any other security, or the making or delivery of any instrument of transfer under the Plan shall be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment.  State and local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  For the avoidance of doubt, the

exemption hereunder specifically applies, without limitation, to all documents necessary to evidence and implement the transactions and actions described in the Plan.

9.      <u>Exemption from Securities Laws</u>.  As directed under § 1145, the requirements of Section 5 of the Securities Act of 1933, and any state or local law requiring registration for the offer, sale, issuance, exchange or transfer of a security provided for in the Plan in exchange for Claims against or Interests in the Debtor, or registration of licensing of an issuer of, underwriter of, or broker dealer in, such security shall not apply to the revesting of all Interests in the Debtor in Thru, LLC under the Plan.

10.     <u>Approval of Assumption or Rejection of Contracts and Leases</u>.  The assumption of each Executory Contract identified on the Assumed Contracts Schedule is hereby authorized and approved as of the Effective Date on the terms set forth in Article VII of the Plan, and with the payment of such Cure Amounts, if any, that are identified on the Assumed Contracts Schedule.

11.     <u>Administrative Expense Request Deadline</u>.  On or as soon after the Effective Date as is reasonably practicable, the Reorganized Debtor shall provide written notice of the Administrative Expense Request Deadline to all Creditors and parties in interest in this case.

12.     <u>Vesting of Assets</u>.  On the Effective Date, all property of the Estate shall vest in the Reorganized Debtor as authorized by §§ 1141(b) and (c), free and clear of all claims and interests of Creditors and other parties in interest except as otherwise expressly provided in the Plan, the Plan Note, or the Exit Facility. From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

13. <u>Treatment is in Full Satisfaction</u>. Except as otherwise provided in the Plan, or agreed in writing or approved by the Court, effective as of the Effective Date, the treatment set forth in the Plan for each Holder of a Claim against or Interest in the Debtor and its Estate is in full and complete satisfaction of the legal, contractual, and equitable rights that such Holder may previously have had in or against the Debtor, the Estate, or its property.

14. <u>Reversal</u>. Except to the extent this Confirmation Order is revoked, if any or all the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of the Court or any other court, in the absence of a stay of the Confirmation Order, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken in good faith under or in connection with the Plan prior to the Debtor's receipt of written notice of entry of any such order. Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, in the absence of a stay of the Confirmation Order, any such act or obligation incurred or undertaken in good faith pursuant to, and in reliance on, this Confirmation Order prior 11to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

15. <u>Injunction</u>. Except as otherwise expressly provided in the Plan or in this Confirmation Order and except in connection with the enforcement of the terms of the Plan (including the payment of Distributions hereunder) or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim

or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree or order against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party with respect to any such Claim or Interest; (d) effecting, directly or indirectly, any setoff or recoupment of any kind against any obligation due to any Protected Party or any property of any Protected Party with respect to any such Claim or Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in Section 9.5 of the Plan shall prohibit the Holder of a Claim or Interest with respect to which a Proof of Claim was timely filed from litigating its right to seek to have such Claim or Interest declared an Allowed Claim or Interest and paid in accordance with the Distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Claim or Interest of any of the obligations of the Debtor or the Responsible Person under the Plan.

16.    <u>Retention of Jurisdiction</u>.    As authorized by §§ 105(a) and 1142, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain jurisdiction over all matters arising out of or related to the Plan or the chapter 11 case to the fullest extent permitted by law.

17.    <u>Effect of Conflict Between Plan and Confirmation Order</u>.  If there is any direct conflict between the terms of the Plan or the Plan Supplement and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

18. <u>References to Plan Provisions</u>. The failure to include or specifically reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety. The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided, however, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

19. <u>Limitation of Releases</u>. Notwithstanding any provision in the Plan or this Confirmation Order to the contrary, no party shall be released of any liability arising in connection with taxes that may be due and owing under Texas state law.

20. <u>Setoff Rights of Texas Comptroller of Public Accounts</u>. Notwithstanding any provision in the Plan or this Confirmation Order to the contrary, the Texas Comptroller of Public Accounts shall retain its right of setoff pursuant to § 553.

21. <u>Notice of Entry of Confirmation Order</u>. No later than ten (10) Business Days following the entry of this Confirmation Order, the Responsible Person shall serve notice of the entry of this Confirmation Order on all parties entitled to receive such notice under Bankruptcy Rules 2002 and 3020 by first-class mail, postage prepaid.

22. <u>Notice of Effective Date</u>. Within five (5) Business Days following the occurrence of the Effective Date, the Responsible Person shall file notice of the Effective Date with the Bankruptcy Court and serve a copy of such notice on the parties named on the Limited Service List maintained in this case.

23.    <u>Authorization to Consummate Plan</u>.    Based upon the evidence adduced at the Confirmation Hearing, cause exists to permit this Confirmation Order to take effect immediately upon its entry.    Accordingly, the stay otherwise imposed by Bankruptcy Rule 3020(e) is hereby waived, and the Debtor may proceed to consummate the Plan and the transactions described therein immediately following entry of this Confirmation Order and the satisfaction of all other conditions, if any, necessary to the occurrence of the Effective Date.

# # # END OF ORDER # # #